## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| *for the use and benefit of* | | |
| **CHASNEY AND COMPANY, INC.,** | * | |
| | | |
| **Plaintiff** | * | |
| | | |
| **v.** | * | **CIVIL NO. JKB-14-2148** |
| | | |
| **HARTFORD ACCIDENT** | * | |
| **& INDEMNITY CO.,** *et al.*, | | |
| | * | |
| **Defendants** | | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### MEMORANDUM

Chasney and Company, Inc. ("Chasney") brought a claim under the Miller Act, 40 U.S.C. § 3133, against Hartford Accident & Indemnity Co. ("Hartford"). Thereafter, James W. Ancel, Inc. ("JWA") secured leave of court to intervene pursuant to Rule 24 of the Federal Rules of Civil Procedure. (ECF No. 8.) Now pending before the Court are two Motions filed by Hartford and JWA ("Defendants"): a Motion for Partial Summary Judgment (ECF No. 27) and a Supplemental Motion for Partial Summary Judgment (ECF No. 51).[1] The issues have been briefed, and no hearing is required, *see* Local Rule 105.6 (D. Md. 2014). For the reasons explained below, Defendants' First Motion will be GRANTED, but Defendants' Second Motion will be DENIED.

---

[1] Throughout this Memorandum, for clarity, the Court will refer to ECF No. 27 as Defendants' First Motion for Partial Summary Judgment (or Defendants' First Motion); the Court will refer to ECF No. 51 as Defendants' Second Motion for Partial Summary Judgment (or Defendants' Second Motion).

## I.    *Background*[2]

This dispute arises from a massive government construction project fraught with disruption and delay.  JWA, as general contractor, executed contract number W912QR-10-C-0029 with the United States of America, by and through the United States Army Corps of Engineers ("USACE" or "the Government"), for the construction of an Army Reserve Center in Baltimore, Maryland ("the Project").  (ECF No. 1 ¶ 5.)  In relation to this contract and pursuant to the Miller Act,[3] JWA executed a payment bond with a penal sum of $9,704,231 for the protection of its subcontractors ("the Bond"), with Hartford acting as surety.  (ECF No. 1–1.)  Thereafter, in August 2010, JWA entered into a subcontract agreement ("the Subcontract") with Chasney, pursuant to which Chasney agreed to perform HVAC and plumbing services for the Project in exchange for $1,500,000.  (ECF No. 1–2 at 1-2.)

Two provisions of the Subcontract are particularly apposite to the Court's analysis of the pending Motions.  Article 5, the "Price and Payment" article, provides that Chasney "shall furnish guarantees and all other documents required by the Prime Contract for [Chasney's] work, including releases of all claims and liens as a condition precedent for final payment," and that "[p]artial releases may be required at [JWA's] option as a condition precedent to any partial payments for work completed."  (*Id.* at 2.)[4]  Article 11, the "Damages for Delay" article, provides that JWA "shall not be liable to [Chasney] for delays caused by the [Government] or

---

[2] The facts and the inferences to be drawn therefrom are taken in the light most favorable to the party opposing summary judgment—in this case, Chasney.  *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

[3] As discussed below, the Miller Act requires government contractors on large projects to furnish performance bonds for the protection of the Government and payment bonds for the protection of subcontractors.  *See* 40 U.S.C. § 3131(b).

[4] In an affidavit, James W. Ancel, Sr. (JWA's president) attested that his firm had worked with Chasney on several projects over the years and that "[i]n each case, the parties used JWA's form subcontract which requires releases be submitted before payments are made."  (ECF No. 35–1 at 3.)  Ancel added that "[a]s a matter of company policy, JWA requires its subcontractors to sign releases on all of its projects as a condition precedent to any partial payments for work completed.  (*Id.*)

other subcontractors or suppliers" but that Chasney "shall be entitled to reimbursement only for damages for delays recovered from the [Government]" and that Chasney "shall have the right, at its expense, to exercise against the [Government] all provisions of the Prime Contract to recover said damages."  (*Id.* at 3.)[5]

Beginning in November 2010 and continuing through November 2013, the parties executed a series of twenty-four instruments titled "Subcontractor's Partial Release, Waiver of Lien and Affidavit" ("Partial Release").  (ECF No. 27–5.)  By signing each Partial Release, "in consideration of the payments previously made and payment for the period covered by the current payment due," Chasney agreed to

> waive[] and release[] all . . . liens . . . and claims and demands against [JWA] and/or its sureties . . . in any manner arising out of [Chasney's] work, labor, services, equipment or materials . . . performed or furnished . . . in connection with the project, through the period covered by the current payment and all previous payments.

(ECF No. 27–6 at 2.)  The waiver language did not apply to "extra work which ha[d] been authorized in writing by [JWA], but for which the payment ha[d] not been made."  (*Id.*)  By signing, Chasney affirmed that it was "aware of no claims nor any circumstances that could give rise to any future claims" against JWA, Hartford, or others involved on the Project.  (*Id.*)  Each form included a space for Chasney to list claim exceptions; no such exceptions appear on any of the twenty-four signed forms.  The last such form, dated November 15, 2013, applies to claims arising on or before October 31, 2013.  (*Id.*)

During the course of performance on the Project, Chasney and JWA encountered numerous design defects and other deficiencies attributable to the Government.  These defects resulted in extended delays and unexpected costs.  JWA submitted over two dozen claims to the

---

[5] In a June 22, 2015, Memorandum, Judge William D. Quarles, Jr., held that the delay-damage provision of Article 11 is enforceable.  (ECF No. 16 at 6-7.)  That holding is the law of the case for the duration of these proceedings. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988).

USACE; these claims eventually ripened into appeals before the Armed Services Board of Contract Appeals ("ASBCA"). (ECF No. 28–2.)  In July 2013, while the appeals were pending, JWA entered into settlement negotiations with the USACE. (ECF No. 28–6 at 3.)  Chasney apparently learned of these negotiations, and—with some drafting assistance from JWA[6]— Chasney submitted a $380,687.65 delay claim through JWA for further transmission to the Government.  JWA's president, James W. Ancel., Sr., forwarded Chasney's delay claim to the USACE on August 8, 2013. (ECF No. 28–8.)  According to Ancel, however, "Government officials were dismissive of Chasney's claim and stated that it lacked any merit.  No value was assigned by the Government to Chasney's claim."  (ECF No. 35–1 at 5.)[7]

On September 10, 2013, JWA and the USACE reached a global settlement ("Settlement Agreement"), which purported to resolve all appeals then pending before the ASBCA as well as "all outstanding disputes and claims relating to the Contract." (ECF No. 56 at 3.)[8]  The USACE agreed to pay JWA a settlement sum of $3,300,000; the parties "did not assign any particular value to individual elements in reaching the settlement sum." (*Id.* at 3-4.)[9]  In exchange for the compromise payment, JWA released the Government "from any and all manner of action or actions . . . with respect to any and all claims of any nature arising out of or relating to the

---

[6] The parties differ over the extent to which JWA assisted Chasney with the preparation of its delay claim.  Peter Chasney, the firm's president, attested that JWA "directed Chasney with respect to the means, manner, format, and contents of the delay claim" and that JWA ultimately "approved" the claim.  (ECF No. 55 at 3.)  James Ancel countered that JWA "gave Chasney some suggestions on how to revise its claim and requested that Chasney provide back[-]up documentation" but that "JWA never 'approved' Chasney's claim" because "JWA always had concerns about the accuracy and the amount of Chasney's claim." (ECF No. 35–1 at 4.)  Ancel added that "JWA did not certify Chasney's claim to the Government because JWA believed Chasney's actual costs were overstated and there was incomplete and insufficient supporting documentation." (*Id.* at 5.)

[7] In his deposition testimony, Ancel expounded on the Government's apparent disdain for Chasney's claim, averring that the USACE negotiators "denied Chasney's claim one hundred percent," deemed it a "total false claim," and characterized it as "garbage." (ECF No. 53–2 at 7-8, 10.)

[8] The Settlement Agreement includes "as fully resolved" all "actual or potential subcontractor claims for labor or material escalation, labor inefficiency, extended field overhead or unabsorbed/extended home office overhead." (ECF No. 56 at 2.)

[9] The first $3,000,000 was payable within forty-five days after execution of the Settlement Agreement. (*Id.* at 4.)  The remaining $300,000 was allocated toward additional utility-installation costs and would be "paid for as the work [was] completed on a percentage complete basis, as per the payment provisions of the Contract." (*Id.*)

4

Contract . . . as of August 20, 2013." (*Id.* at 5.)  JWA signed the agreement on September 12, 2013; the USACE signed on September 13, 2013; and the first $3,000,000 payment was invoiced on October 23, 2013.  (ECF Nos. 56 at 8 & 28–11 at 1.)  JWA received this payment on November 4, 2013.  (ECF No. 35–1 at 5.)

In an e-mail dated April 25, 2014, Peter Chasney (Chasney's president) advised James Ancel that (1) he understood that Chasney's delay claim had been paid as part of the Settlement Agreement and (2) he therefore requested reimbursement of $380,687.65.  (ECF No. 55 at 29.)  In a May 12, 2014, e-mail, Ancel informed Peter Chasney that his understanding was "simply not correct"; that the "settlement with the government was a lump sum amount"; and that the "parties did not assign any particular value to individual elements in reaching the settlement sum." (*Id.* at 33.)  To date, JWA has refused to pay Chasney's claim.[10]

Chasney filed suit on July 2, 2014, naming Hartford as Defendant and claiming against the Bond.  (ECF No. 1.)  Chasney demanded $380,687.65 for its delay damages as well as $79,882.45 for labor-and-material expenses allegedly due and owing, for a total claim of $460,570.10.[11]  JWA intervened in the action on September 15, 2014.  (ECF No. 8.)  Defendants filed their First Motion for Partial Summary Judgment on August 21, 2015 (ECF No. 27); Chasney filed a response in opposition (ECF No. 28), and Defendants replied (ECF No. 35).  On January 14, 2016, the case was transferred from Judge William D. Quarles, Jr., to the

---

[10] In its response in opposition to JWA's First Motion for Partial Summary Judgment, Chasney noted that James Ancel made a $75,000 settlement offer back in May 2014.  (ECF No. 28 at 9.)  In its February 2, 2016, Memorandum and Order, the Court ruled that evidence of Ancel's settlement offer is inadmissible under Rule 408 of the Federal Rules of Evidence and therefore properly excluded at the summary-judgment stage.  (ECF No. 52 at 8.)  Consistent with its prior ruling, the Court will give no further consideration to Ancel's settlement offer.

[11] In a Motion for Leave to Amend Complaint (ECF No. 37), which the Court denied on February 2, 2016 (ECF No. 52), Chasney indicated that "the discovery process has revealed that the amount paid by [JWA] to Chasney and/or to Chasney's subcontractors and suppliers is greater than the amount set forth in the Complaint."  (ECF No. 37 at 5.)  Accordingly, Chasney reduced its $79,882.45 labor-and-material claim to $6456.14.  (ECF No. 37–2 at 4.)  As will be discussed in detail below, the Court has determined that the October 31, 2013, Partial Release waives all claims relating to the Subcontract that arose on or before that date.  However, the Court cannot determine from the summary-judgment record whether any portion of the remaining $6456.14 for labor and materials arose after October 31, 2013.  Any such portion remains in controversy at this stage.

undersigned.  Thereafter, Defendants filed their Second Motion for Partial Summary Judgment.  (ECF No. 51.)  Chasney responded (ECF No. 53), and Defendants replied (ECF No. 60).  Both motions are ripe for decision.

## II.   *Standard of Review*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)).  No genuine issue of material fact exists if the opposing party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof.  *Celotex Corp.*, 477 U.S. at 322-23.  Moreover, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The United States Court of Appeals for the Fourth Circuit has emphasized the "affirmative obligation of the trial judge to prevent 'factually unsupported claims [or] defenses' from proceeding to trial."  *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex Corp.*, 477 U.S. at 323-24).

The facts themselves, and the inferences to be drawn therefrom, must be viewed in the light most favorable to the party opposing summary judgment.  *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).  Even so, the opponent may not rest upon the mere allegations or denials of its pleading but must instead, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial.  Fed. R. Civ. P. 56(c)(1).  Supporting and opposing affidavits must be made on personal knowledge with such

facts as would be admissible in evidence and must affirmatively show the competence of the affiant to testify to the matters stated therein.  Fed. R. Civ. P. 56(c)(4).

### III.    *The Miller Act*

Under the Miller Act, before any federal contract with a value exceeding $100,000 can be awarded for the construction or improvement of a public building, the putative contractor must furnish to the Government (1) a performance bond for the protection of the Government and (2) a payment bond for the protection of "all persons supplying labor and material in carrying out the work provided for in the contract," *e.g.*, subcontractors.  40 U.S.C. § 3131(b).  "The Miller Act is the modern-day remedy to the historical dilemma faced by contractors and materialmen denied compensation in federal construction projects."  *Technica LLC ex rel. United States v. Carolina Cas. Ins. Co.*, 749 F.3d 1149, 1151 (9th Cir. 2014).  Because the subcontractor's ordinary fail-safe—the mechanic's lien—is inapposite when the subject property is owned by the federal government, the Miller Act provides an alternative, creating a "cause of action in favor of all furnishers of labor and materials to recover the amount due under the contract."  *HPS Mech., Inc. v. JMR Constr. Corp.*, No. 11-cv-02600-JCS, 2014 WL 3845176, at *12 (N.D. Cal. Aug. 1, 2014); *see also* 40 U.S.C. § 3133(b) (authorizing civil actions on Miller Act payment bonds).[12]

Because it is a "cardinal rule of the surety/principal relationship that a surety occupies the shoes of its principal," *HPS Mech., Inc.*, 2014 WL 3845176, at *13 (quoting *United States ex rel. Walton Tech., Inc. v. Weststar Eng'g, Inc.*, 290 F.3d 1199 (9th Cir. 2002) (Trott, J., concurring and dissenting)), in general, the surety's liability on the payment bond is "defined by the liability

---

[12] Consistent with its strong protections for subcontractors, the Miller Act includes a restrictive waiver provision:

> A waiver of the right to bring a civil action on a payment bond . . . is void unless the waiver is—
> (1) in writing; (2) signed by the person whose right is waived; and (3) executed after the person whose right is waived has furnished labor or material for use in the performance of the contract.

40 U.S.C. § 3133(c).  The parties do not address this waiver provision in their briefs.  However, assuming *arguendo* that this provision could apply to the type of claim waiver at issue in this case, its requirements are satisfied by the Partial Releases:  Chasney's agents executed such releases in exchange for part payment *after* Chasney completed segments of work on the Project.

of the underlying contract," *id.* (quoting *Morganti Nat'l, Inc. v. Petri Mech. Co.*, No. Civ.A.3:98CV309 (SRU), 2004 WL 1091743, at *11 (D. Conn. May 13, 2004)).  In other words: with narrow exceptions not applicable here, the surety on a Miller Act payment bond is liable only to the extent that the general contractor would be liable—and the surety may avail itself of most contract defenses, including the doctrines of release and waiver.  *E.g.*, *United States ex rel. Kogok Corp. v. Travelers Cas. & Sur. Co. of Am.*, 55 F. Supp. 3d 852, 857-59 (N.D. W. Va. 2014).[13]

## IV.    *Defendants' First Motion for Partial Summary Judgment (ECF No. 27)*

In their First Motion, Defendants contend that "Chasney's claims for work, labor, services, equipment, or materials performed or furnished through October 31, 2013, including any delay damages . . . are barred by releases signed by Chasney."  (ECF No. 27 at 1.)

The interpretation of a release agreement implicates state-law principles.[14]  In this case, the Subcontract includes a choice-of-law provision directing the Court to apply Maryland law.[15]  Under Maryland law, releases are treated as contracts and are "construed and applied according to the rules of contract law."   *Owens-Ill., Inc. v. Cook*, 872 A.2d 969, 985 (Md. 2005).  "Moreover, it is well settled that '[a] release is to be construed according to the intent of the parties and the object and purpose of the instrument, and that intent will control and limit its operation.'"  *Id.* (alteration in original) (quoting *Shriver v. Carlin & Fulton Co.*, 141 A. 434, 440

---

[13] The Bond at issue in this case is drafted in a manner consistent with these general principles:  it provides that its obligation becomes void if JWA "promptly makes payment to all persons having a direct relationship with [JWA] or a subcontractor of [JWA] for furnishing labor, material or both in the prosecution of . . . the contract . . . and any authorized modifications of the contract that subsequently are made."  (ECF No. 1–1 at 1.)

[14] *See United States ex rel. Renegade Equip., LLC v. W. Sur. Co.*, No. 3:07CV00187 JWS, 2009 WL 2143637 (D. Alaska July 15, 2009) ("[S]tate law controls the interpretation of Miller Act subcontracts to which the United States is not a party." (quoting *United States ex rel. Reed v. Callahan*, 884 F.2d 1180, 1185 (9th Cir. 1989))); *see also United States ex rel. Fordham v. P.W. Parker, Inc.*, 504 F. Supp. 1066, 1072 (D. Md. 1980) ("Where the construction of the Miller Act is involved, federal not state law is involved.  However, where the 'construction' of the Miller Act [is] 'not at issue' . . . the Fourth Circuit look[s] to the law of th[e] . . . state 'in determining the respective rights of the parties' to the subcontract." (citations omitted) (quoting *United States ex rel. Shields, Inc. v. Citizens & S. Nat'l Bank of Atlanta, Ga.*, 367 F.2d 473, 477 (4th Cir. 1966))).

[15] Article 37 provides that the "Subcontract shall be governed by the laws of the State where the Contractor has its principal office." (ECF No. 1–2 at 8.)  JWA's principal office is located in Towson, Maryland.  (*Id.* at 1.)

(Md. 1928)).  Even so, Maryland courts apply the objective theory of contract interpretation.  A court construing an agreement under the objective theory

> must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. . . . [W]hen the language of the contract is plain and unambiguous[,] there is no room for construction, and a court must presume that the parties meant what they expressed.

*Taylor v. NationsBank, N.A.*, 776 A.2d 645, 653 (Md. 2001) (quoting *Gen. Motors Acceptance Corp. v. Daniels*, 492 A.2d 1306, 1310 (Md. 1985)).

A litigant seeking to avert the sting of an ill-conceived release agreement has an obvious incentive to argue that the parties never intended the release to encompass the claims at issue. Nevertheless, under the objective theory, a court will only consider extrinsic evidence concerning the parties' intent if it first deems the contract's language ambiguous.  *Spacesaver Sys., Inc. v. Adam*, 98 A.3d 264, 277 n.12 (Md. 2014).  "[A]n ambiguity does not exist simply because a strained or conjectural construction can be given to a word," nor does an agreement become ambiguous merely because two litigants offer different interpretations of its language. *Huggins v. Huggins & Harrison, Inc.*, 103 A.3d 1133, 1140 (Md. Ct. Spec. App. 2014) (quoting *Dumbarton Improvement Ass'n v. Druid Ridge Cemetery Co.*, 73 A.3d 224, 233 (Md. 2013)).

In its opposition brief, Chasney contests both the validity and the applicability of the Partial Releases.  Chasney advances some creative arguments in support of its position, but these arguments are unavailing.

### A.    *Validity of the Partial Releases*

#### 1.    *Voluntary Relinquishment of a Known Right*

Chasney contends that it did not voluntarily agree to the Partial Releases and that the waiver language therein is thus "ineffective and not enforceable."  (ECF No. 28 at 14.)  *See*

*Gresser v. Wells Fargo Bank, N.A.*, Civ. No. CCB-12-987, 2014 WL 1320092, at *7 (D. Md. Mar. 31, 2014) ("Under Maryland law, '[a] waiver is the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from circumstances.'" (alterations in original) (footnote omitted) (quoting *Kiley v. First Nat'l Bank of Md.*, 649 A.2d 1145, 1155 (Md. Ct. Spec. App. 1994)). Specifically, Chasney asserts that "because Chasney was required by Subcontract Article 5 to furnish [Partial Releases] in order to obtain its partial payments, Chasney's provision of the [Releases] was not voluntary." (ECF No. 28 at 14.) This argument can be dispatched quickly. There is no question that Chasney, a sophisticated party that had dealt with JWA on prior occasions,[16] voluntarily entered the Subcontract agreement, the terms of which required Chasney to execute the Partial Releases at JWA's option. Chasney was under no compulsion to enter such an agreement; having done so, it will not be heard to complain about the conditions to which it freely and voluntarily assented.[17]

Chasney also contends that the Partial Releases did not constitute a relinquishment of a *known right* because, at the time Chasney executed the releases, it was not entitled to compensation for its delay damages. (ECF No. 28 at 15.) Chasney cites Article 11 of the Subcontract, which shields JWA from liability for delay damages unless JWA has recovered such damages from the Government. (*Id.*) Of course, as discussed above, JWA did recover such

---

[16] *See supra* note 4.

[17] Chasney cites *Fantle v. Fantle*, 782 A.2d 377 (Md. Ct. Spec. App. 2001), in support of its involuntariness theory, but that case is inapposite. In *Fantle*, the Court of Special Appeals of Maryland considered whether the petitioner's ex-spouse, by informally agreeing to accept a reduction in alimony, waived her right to fully enforce the parties' settlement agreement. The court looked to the ex-spouse's communications with the petitioner as well as her conduct (*e.g.*, her voluntary cashing of the petitioner's checks). In this case, by contrast, the Court need not strain to grasp the extent to which Chasney relinquished its claims against JWA: the Partial Releases are thorough in detail and broad in scope.

It is also worth noting that the *Fantle* court did not actually decide the waiver issue. In fact, in remanding for further evidentiary review, the court remarked that the record might ultimately show voluntary relinquishment of a known right. *Id.* at 382.

damages—but although JWA and the USACE finalized their Settlement Agreement in September 2013, and although the lump-sum $3,000,000 payment was invoiced in October 2013, JWA *technically* did not receive any funds until November 4, 2013.  Consequently, Chasney believes that the October 31 Partial Release was "completely ineffective to waive or release Chasney's rights to compensation for the [delay] damages."  (*Id.*)

Unfortunately for Chasney, its logic finds no support in the law.  Parties routinely enter settlement agreements through which they waive *all* claims—present and future, known and unknown—arising from a particular set of circumstances, and courts routinely enforce such agreements.  *See, e.g.*, *Bernstein v. Kapneck*, 430 A.2d 602, 609 (Md. 1981) (holding that a prior release of all claims "on account of bodily injuries, known and unknown, and which have resulted or may in the future develop" barred the petitioner's claim for later-discovered injuries); *Command Tech., Inc. v. Lockheed Martin Corp.*, No. 0469, 2015 WL 6470277, at *10 (Md. Ct. Spec. App. Oct. 27, 2015) (affirming trial court's enforcement of general release that discharged defendant "from all liabilities, obligations, claims, and demands whatsoever, under or arising from [the contract at issue], whether known or unknown at th[e] time"); *cf. Herget v. Herget*, 573 A.2d 798, 801 (Md. 1990) (rejecting the notion that parties are incapable of releasing rights that do not presently exist).  In this case, Chasney plainly knew that it had a pending delay claim: indeed, it had submitted its claim through JWA in August 2013.  By executing the October 31 Partial Release without exempting its claim, Chasney relinquished its right to pursue the claim should it ever ripen.  In hindsight, Chasney may regret its decision to sign such a release—but the Court's task is to "examine the agreement the parties did sign, not the agreement that one or the other now wishes they had negotiated instead," *Newell v. Johns Hopkins Univ.*, 79 A.3d 1009, 1023 (Md. Ct. Spec. App. 2013).  Accordingly, the Court concludes that Chasney

voluntarily relinquished a known right (*i.e.*, the right to pursue its delay claim as against JWA). The Court next considers whether the Partial Releases were nevertheless defective as a matter of contract law.

### 2.    *Elements of Contract Formation*

Chasney posits that the Partial Releases were invalid because "there was no meeting of the minds with respect to the [releases]" and because "the consideration paid to support the [releases] was insufficient." (ECF No. 28 at 16.) Both arguments fail.

As to Chasney's first argument (*i.e.*, no meeting of the minds), it is certainly true that "[a]n essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof,'" *Mitchell v. AARP Life Ins. Program*, 779 A.2d 1061, 1069 (Md. Ct. Spec. App. 2001) (quoting *Safeway Stores, Inc. v. Altman*, 463 A.2d 829, 831 (Md. 1983)). But the means by which courts ascertain the terms, if any, to which parties have assented is the objective theory of contract interpretation, *see Taylor*, 776 A.2d at 653. As long as a contract's terms are unambiguous, a litigant's *ex post* account of its subjective intentions is irrelevant. *See Sauer Inc. v. Honeywell Bldg. Sols. SES Corp.*, 742 F. Supp. 2d 709, 719 (W.D. Pa. 2010) ("Where a release contains a clear and unambiguous waiver of a claim, a contracting party cannot evade the effect of that release by contending that it did not subjectively intend to waive the claim at issue."); *cf. Kay–R Elec. Corp. v. Stone & Webster Constr. Co.*, 23 F.3d 55, 57 (2d Cir. 1994) ("[W]e are not concerned with what was going through the heads of the parties at the time [certain] requisitions were signed . . . . Rather, we are talking about objective principles of contract law."). Here, Chasney does not even attempt to argue that the language of the Partial Releases is ambiguous; instead, Chasney proffers that (1) JWA "never took the position that it was not obligated to pay Chasney for the [delay damages]

. . . until now" and (2) "Chasney never intended or believed that it was releasing its rights to recover damages for the Government caused delays when it executed the [Partial Releases]." (ECF No. 28 at 17.)  In other words, Chasney invites the Court to undertake precisely the kind of *ex post* subjective inquiry that is incompatible with objective contract interpretation:  the Court declines Chasney's bold invitation.[18]

As to Chasney's second argument (*i.e.*, insufficient consideration), Chasney invokes the preexisting duty rule, a staple of hornbook law.  The theory is simple enough:  "payment of a sum which the payee [*sic*] was under a previous legal or statutory obligation to pay is not sufficient consideration to support a contract."  (ECF No. 28 at 18.)  Since JWA was obligated, pursuant to the Subcontract, to compensate Chasney for its contributions to the Project, Chasney reasons that the Partial Releases—purportedly executed "in consideration of the payments previously made and payment for the period covered by the current payment due" (*see* ECF No. 27–6 at 2)—are void for lack of additional consideration.  Were the Court to construe the Partial Releases in isolation as independent, freestanding contracts, Chasney's argument might have traction.  But because the Partial Releases are expressly authorized by the Subcontract, the more reasonable approach is to view them as supported by the same consideration that supports the Subcontract—*i.e.*, the $1,500,000 compensation that JWA promised to pay Chasney.  And indeed, courts have frequently adopted this approach, holding that "a release required by the provisions of a contract is supported by the same consideration that supports the contract itself," *Sauer*, 742 F. Supp. 2d at 720 (quoting *Yakima Asphalt Paving Co. v. Wash. State Dep't of Transp.*, 726 P.2d 1021, 1024 (Wash. Ct. App. 1986)); *see also Military & Fed. Constr. Co. v. Ace Elec., Inc.*, No. 7:14-CV-23-D, 2015 WL 3953814, at *5 (E.D.N.C. June 29, 2015) ("A

---

[18] Chasney also suggests that JWA's interpretation of the Partial Releases "would mean that [JWA] submitted a false claim to the Government."  (ECF No. 28 at 16.)  Chasney repeats this specious argument elsewhere, and the Court addresses it in Part IV.B, *infra*.

waiver that is required in the original subcontract . . . is supported by the consideration that supports the subcontract."); *First Gen. Constr. Corp. v. Kasco Constr. Co.*, Civ. No. 10-2655, 2011 WL 2038542, at \*5 (E.D. Pa. May 24, 2011) ("[T]he consideration for the releases is the same as the consideration for [the] Subcontract.   Accordingly, no additional or independent consideration is necessary because the parties were careful to include the releases as a term of the contract." (quoting *Kenneth Hantman, Inc. v. Whiting-Turner Contracting Co.*, Civ. No. 07-1574, 2008 WL 4072591, at \*7 (E.D. Pa. Sept. 2, 2008))); *Inland Empire Builders, Inc. v. United States*, 424 F.2d 1370, 1376 (Ct. Cl. 1970) ("Decisions of this court that a release called for by a contract is not without consideration, even though the contractor receives only amounts otherwise due, are legion[.]"); *Command Tech., Inc.*, 2015 WL 6470277, at \*14 ("We hold that the execution of the Release was a precondition of payment under the contract, and, therefore, no new consideration was necessary . . . .").[19]

---

[19] Chasney further contends that JWA was obligated, pursuant to the Prompt Payment Act ("PPA"), 31 U.S.C. § 3905(b), to remit timely payments to Chasney.  (ECF No. 28 at 19.)  Thus, Chasney reasons, the Partial Releases must have lacked consideration—since JWA had a statutory obligation to pay Chasney regardless of whether it executed such releases.  (*Id.* at 19-20.)

 Chasney's contention fails for two reasons.  First, the provision of the PPA on which Chasney relies— § 3905(b)—does not purport to impair or modify private agreements between contractors.  Rather, it prescribes requirements for contracts awarded by federal agencies:

> Each construction contract awarded by an agency shall include a clause that requires the prime contractor to include in each subcontract . . . (1) a payment clause which obligates the prime contractor to pay the subcontractor for satisfactory performance under its subcontract within 7 days out of such amounts as are paid to the prime contractor . . . and (2) an interest penalty clause which obligates the prime contractor to pay to the subcontractor an interest penalty on amounts due in the case of each payment not made in accordance with the payment clause . . . .

Although this provision obviously inures to the benefit of subcontractors on federal projects, courts have consistently held that the PPA "does not confer a private right of action upon subcontractors," *United States ex rel. Drill Tech Drilling & Shoring, Inc. v. Lexon Ins. Co.*, No. SACV 14-01573 DDP (ANx), 2015 WL 3498614, at \*3 (C.D. Cal. June 3, 2015) (collecting cases).

 Second, nothing in the PPA prevents parties from attaching conditions or provisos to their payment arrangements.  Rather, the statute is directed toward the *timing* of payment.  Article 5 of the Subcontract at issue here provides that Chasney shall furnish "releases of all claims and liens as a condition precedent for final payment" and that "[p]artial releases may be required at [JWA's] option as a condition precedent to any partial payments for work completed."  (ECF No. 1–2 at 2.)  That provision, which in turn supports the waiver language in the Partial Releases, has nothing whatever to do with the timing of payment.  Consequently, the PPA is inapposite.

In light of the foregoing, the Court concludes that the Partial Releases are valid and enforceable as a matter of contract law.[20]

### B.    Applicability of the Partial Releases

Chasney posits in the alternative that even if the Partial Releases are enforceable as against *some* claims, they are not enforceable as against Chasney's delay claim.   Chasney presents several unconvincing arguments in support of this alternative position.

Principally, Chasney contends that the October 31, 2013, release "could not have operated as a release of Chasney's claim for delay damages which [JWA] had not yet received from the Government and to which Chasney was not yet entitled under the provisions of Subcontract Article 11."  (ECF No. 28 at 11-12.)  This contention is materially indistinguishable from Chasney's argument that the Partial Releases did not constitute relinquishment of a known right—and it fails for a similar reason.  The Partial Releases unambiguously waive "claims and demands . . . in any manner arising out of . . . work, labor, services, equipment or materials . . . performed or furnished . . . in connection with the project, through the period covered by the current payment and all previous payments."  (ECF No. 27–6 at 2.)  Nothing in this language restricts the operation of the waiver to fully ripened, perfected claims for which Chasney enjoys a present right to payment.  In fact, in signing each Partial Release—including the October 31 release—Chasney affirmed under the penalties for perjury that it was "aware of no claims *nor*

---

[20] In so doing, the Court finds itself in good company.  *See United States ex rel. Kogok Corp. v. Travelers Cas. & Sur. Co. of Am.*, 55 F. Supp. 3d 852, 859 (N.D. W. Va. 2014) (finding that partial-payment releases were enforceable and that such releases precluded recovery on claims accruing during covered periods); *accord Addicks Servs., Inc. v. GGP–Bridgeland, LP*, 596 F.3d 286, 298 (5th Cir. 2010); *MAFCO Elec. Contractors, Inc. v. Turner Constr. Co.*, 357 F. App'x 395, 397 (2d Cir. 2009); *Kay–R Elec. Corp. v. Stone & Webster Constr. Co.*, 23 F.3d 55, 59 (2d Cir. 1994); *Galin Corp. v. MCI Telecomms. Corp.*, 12 F.3d 465, 469 (5th Cir. 1994); *First Gen. Constr. Corp. v. Kasco Constr. Co.*, Civ. No. 10-2655, 2011 WL 2038542, at *5 (E.D. Pa. May 24, 2011); *Sauer Inc. v. Honeywell Bldg. Sols. SES Corp.*, 742 F. Supp. 2d 709, 720-21 (W.D. Pa. 2010); *Artistic Stone Crafters, Inc. v. Safeco Ins. Co. of Am.*, 726 F. Supp. 2d 595, 602 (E.D. Va. 2010); *Johnson Controls, Inc. v. Hunt Constr. Grp., Inc.*, No. 02-CV-74039-DT, 2004 WL 3323608, at *8 (E.D. Mich. Aug. 13, 2004); *United States ex rel. Chase Somerset Corp. v. Becon Servs. Corp.*, 837 F. Supp. 461, 465 (D.D.C. 1993).

*any circumstances that could give rise to any future claims*" against JWA.   (*Id.* (emphasis

added).)   The forms include a space for Chasney to list any exceptions; this space is blank on

each of the twenty-four forms.[21]   Reading the Partial Releases in their entirety, then, the plain

language conveys only one plausible meaning:  the parties agreed to a broad waiver of *all claims*,

save those specifically excluded, stemming from work performed through the covered periods.

Thus, it is irrelevant that the Subcontract bars Chasney from actually collecting delay damages

from JWA unless JWA first recovers such damages from the Government.   As of October 31,

2013, Chasney unmistakably had a delay *claim*, which claim it waived by executing a release.[22]

Chasney additionally contends that even if the October 31 Partial Release covered

Chasney's delay claim, "the express language of the [release] excepted Chasney's delay claim

from its operation."   (ECF No. 28 at 12.)   Here, Chasney points to a provision of the Partial

Releases which indicates that the releases do not apply to "extra work which has been authorized

in writing by [JWA], but for which the payment has not been made."   (ECF No. 27–6 at 2.)

Chasney suggests that (1) its "delay claim represents additional work which Chasney was

required to render to the Project as a result of the Government caused delay"; and (2) JWA

"directed Chasney to submit its delay claim" and assisted Chasney with formatting and

substantiating the claim.   (ECF No. 28 at 12.)   Thus, Chasney reasons, JWA "clearly authorized

---

[21] Chasney proffers a feeble excuse for its failure to exclude its delay claim from the October 31 Partial Release: "Given that [JWA] . . . worked closely with Chasney in preparing and submitting the delay claim, it was unconceivable to Chasney that [JWA] would refuse to pay Chasney for its delay claim."   (ECF No. 28 at 13.)   This is less an explanation and more a protestation; it is not the function of a federal court to save litigants from their lack of foresight.   *See Kogok Corp.*, 55. F. Supp. 3d at 858 ("When a contractor 'has the right to reserve claims from the operation[] of [a] release, but fails to exercise that right . . . it is neither improper nor unfair, absent some vitiating or aggravated circumstance, to preclude the contractor from maintaining a suit based on events which occurred prior to' executing the release." (citing *Clark Mech. Contractors, Inc. v. United States*, 5 Cl. Ct. 84, 86 (1984))).

[22] The Court stresses the sequence of events:  by October 31, 2013, Chasney had submitted its delay claim through JWA for Government consideration; JWA had negotiated, finalized, and signed the Settlement Agreement with the USACE; and the lump-sum $3,000,000 payment had been invoiced.   All that remained of this lengthy settlement process was for the Government to wire the funds to JWA's account.   For that matter, the October 31 Partial Release was executed on November 15, 2013—nearly two weeks *after* JWA received its payment.   Under such circumstances, Chasney's contention that the release antedated and therefore could not have operated to waive its delay claim holds no water.

Chasney's delay claim in writing." (*Id.*) Chasney's reasoning is defective. Even assuming *arguendo* that JWA provided Chasney with the degree of assistance that Chasney recounts (a point that JWA contests), assisting a subcontractor with preparation of a government claim cannot seriously be equated with directing a subcontractor (in writing) to perform additional work on a project.

In a last-ditch effort to sway the Court, Chasney proposes that *if* JWA is correct, and *if* Chasney in fact waived its right to recover damages by operation of the October 31 Partial Release, then JWA may have violated the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, by submitting and settling Chasney's delay claim with the Government. (ECF No. 28 at 13.) That argument is absurd. JWA signed the Settlement Agreement with the USACE more than two months before Chasney executed the October 31 release; thus, at the time JWA submitted Chasney's claim for Government review, no waiver was in effect. Moreover, even if— hypothetically—JWA somehow violated the FCA through its settlement of Chasney's claim, such violation would not vitiate a wholly separate, private release agreement negotiated between JWA and Chasney. And crucially, James Ancel stated under oath that "JWA did not certify Chasney's claim to the Government because JWA believed that Chasney's actual costs were overstated and there was incomplete and insufficient supporting documentation." (ECF No. 35– 1 at 5.) Unsurprisingly, "Government officials were dismissive of Chasney's claim and stated that it lacked any merit." (*Id.*) Chasney has never adduced admissible evidence tending to refute Ancel's testimony. On these facts, there is simply no indication that JWA violated federal law, nor that any hypothetical violation is relevant to the issues before the Court.

In summary, the Court's analysis begins and ends—as it must—with the unambiguous language of the Partial Releases. By signing each release, Chasney waived all claims relating to

work performed through the covered period: no reasonable factfinder could conclude otherwise. While Chasney's opposition brief teems with subtle linguistic maneuvers (and more than a few red herrings), Chasney cannot avoid the plain consequences of its contracting through artful argument. The Court will thus GRANT Defendants' First Motion for Partial Summary Judgment.[23]

## V.    *Defendants' Second Motion for Partial Summary Judgment (ECF No. 51)*

Defendants' First Motion is directed toward all damages that Chasney allegedly incurred on or before October 31, 2013—whether delay damages or unpaid compensation under the Subcontract. Defendants' Second Motion, by contrast, is directed toward delay damages exclusively—but now, Defendants contend that Chasney is entitled to no such damages whatsoever.

Defendants present two arguments in support of their Second Motion. First, Defendants argue that "Chasney has neither produced nor uncovered any evidence . . . that JWA received payment from the United States for Chasney's delay claim." (ECF No. 51–1 at 3.) Second, Defendants argue that Chasney cannot satisfy any of the elements necessary to prove its damages under the "total cost method," the cost-estimation method that Chasney apparently intends to employ at trial. (*Id.*) Neither argument is persuasive.

### A.    *Chasney's Delay Claim*

Defendants propose that partial summary judgment is warranted because Chasney has failed to adduce any admissible evidence tending to show that the Government actually paid any portion of its delay claim. For his part, James Ancel has consistently testified that the Government denied Chasney's claim "one hundred percent" as meritless. (*See* ECF Nos. 35–1 at 5; 51–3 at 6; 53–2 at 6-7.) Conversely, when asked on deposition what information he had

---

[23] Because the Court grants Defendants' First Motion, Chasney will be precluded in these proceedings from recovering any damages (including but not limited to delay damages) arising out of work performed on or before October 31, 2013.

received that led him to believe the Government had paid his firm's claim, Peter Chasney admitted: "Don't know.  Never got that kind of information."  (ECF No. 51–7 at 13.)  Because there is no evidence that JWA recovered any funds specifically allocable to Chasney's claim,[24] Defendants reason that the "claim is barred by the [delay-damage provision] of the Chasney Subcontract, which this Court has already ruled to be enforceable."  (ECF No. 51–1 at 6.)

The problem with Defendants' analysis is that it conflicts with the plain language of Article 11 of the Subcontract.  Article 11 provides that "[JWA] shall not be liable to [Chasney] for delays caused by the [Government] or other subcontractors or suppliers.  *[Chasney] shall be entitled to reimbursement only for damages for delays recovered from the [Government] . . . ."* (ECF No. 1–2 at 3 (emphasis added).)  By its terms, Article 11 does not restrict Chasney's putative recovery to those delay damages allocable to a particular claim approved by the Government.  Nor does it limit Chasney's recovery to those delay damages recouped by JWA acting on Chasney's behalf.[25]  Instead, Article 11 simply entitles Chasney to reimbursement for delay damages recovered from the Government.  JWA may well have intended this language to sweep more broadly—but just as Chasney's subjective intent was insufficient to defeat the unambiguous language of the Partial Releases, JWA's subjective intent is insufficient to defeat

---

[24] In its opposition brief, Chasney attempts to discredit Ancel's testimony, suggesting that "[h]ad the USACE truly rejected Chasney's delay claim . . . the USACE or [JWA] could have noted that 'fact' in the Settlement Agreement. . . . Accordingly, [the Court] is required to draw the justifiable inference . . . that the USACE neither rejected Chasney's delay claim nor assigned it no value."  (ECF No. 53 at 4-5.)

Chasney is mistaken:  the Court is required to draw no such inference, and in fact it would be improper for the Court to do so.  Where the summary-judgment movant presents competent evidence (through sworn testimony), and the nonmovant meets that evidence with nothing more than raw speculation, the nonmovant fails to establish a genuine dispute for trial.  *Cf. Holt v. Camus*, 128 F. Supp. 2d 819, 821 (D. Md. 2000) ("A party may not rely on the possibility that a negative inference will be drawn from a witness's testimony to establish that the opposite of what the witness says is true."), *aff'd*, 217 F.3d 839 (4th Cir. 2000) (per curiam) (unpublished table decision).

[25] Chasney picks up on this line of argument in its opposition brief, citing *Nolfi Masonry Corp. v. Lasker–Goldman Corp.*, 553 N.Y.S.2d 156 (App. Div. 1990), a case Chasney describes as "remarkably similar to the instant case." (ECF No. 53 at 17.)  While the Court agrees with Chasney that "[w]hether Chasney's delay claim . . . was meritorious or not[] is . . . immaterial" (*id.*), the Court finds *Nolfi* unhelpful.  In *Nolfi*, the parties disputed the existence of a liquidation agreement or, alternatively, the consideration supporting such agreement; in this case, by contrast, both parties recognize that the Subcontract (inclusive of its delay-damage provision) is valid and enforceable.

the likewise unambiguous language of Article 11. *See Taylor*, 776 A.2d at 653 ("[W]hen the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed." (quoting *Daniels*, 492 A.2d at 1310)).

This is not to suggest, of course, that Article 11 creates a carte blanche for recovery. Chasney will bear the burden of proof at a trial on its Miller Act claim, *see United States ex rel. Patton Contractors, Inc. v. Innovative Performance Contracting, Inc.*, Civ. No. 3:13-CV-2198-D, 2014 WL 4798449, at *2 (N.D. Tex. Sept. 26, 2014), and Chasney must therefore prove its damages to the requisite degree of reasonable certainty, *see Hoang v. Hewitt Ave. Assocs., LLC*, 936 A.2d 915, 935 (Md. Ct. Spec. App. 2007). As recognized in Part V.B, *infra*, Chasney may have some difficulty satisfying that requirement. But Defendants cannot avoid liability by reconfiguring the plain language of the Subcontract—and Chasney's failure to prove that the Government paid its delay claim will not bar it from proceeding on its Miller Act theory.

**B.    *Chasney's Cost-Estimation Method***

Defendants alternatively propose that partial summary judgment is warranted because (1) Chasney intends to prove its damages pursuant to the disfavored "total cost method"[26] but (2) the calculations performed by Chasney's designated expert (Paul B. Krogh of K2 Construction Consultants, Inc.) are insufficient for Chasney to prevail under this method.[27] Citing a string of procedurally distinguishable cases decided outside this Circuit, along with a practice guide

---

[26] *See Youngdale & Sons Constr. Co. v. United States*, 27 Fed. Cl. 516, 541 (1993) ("In essence, the amount of damages recoverable under the total cost method is roughly equivalent to the total actual costs incurred in performing the contract minus the contractor's bid price or estimated costs. Use of this method is highly disfavored by the courts, because it blandly *assumes*—that every penney [*sic*] of the plaintiff's costs are *prima facie* reasonable, that the bid was accurately and reasonably computed, and that the plaintiff is not responsible for any increases in cost."), *rejected on other grounds by R.P. Wallace, Inc. v. United States*, 63 Fed. Cl. 402 (2004).

[27] Chasney has never explicitly stated that it intends to prove its damages via the total cost method. However, in his expert disclosure, Paul Krogh noted that Chasney had retained him to "calculate Chasney's total labor cost overrun and extended site costs incurred on the Army Reserve Center." (ECF No. 51–5 at 2.) During his deposition, Krogh added that (1) Chasney's delay claim was a total cost claim and (2) while Krogh adjusted the claim to reflect certain change orders, "in [his] mind [the claim is] still a total cost [claim] . . . because the change orders are part of the contract." (ECF No. 51–6 at 10.) As Krogh explained it, "you look at what did I spend, less my bid, less my approved change orders. That's my overrun." (*Id.*)

promulgated by the Association for the Advancement of Cost Engineering ("AACE"), Defendants contend that Chasney must prove the following: (1) that the nature of Chasney's losses makes it impracticable to determine damages in a more precise manner; (2) that Chasney's original bid was reasonable; (3) that Chasney's actual costs were reasonable; and (4) that Chasney was not responsible for the events resulting in its lost productivity. (ECF No. 51–1 at 10.) When asked about each of these elements during his deposition, Paul Krogh admitted that he had not considered them in relation to Chasney's delay claim. (ECF No. 51–6 at 9.)

Although the Court is aware of no binding authority in this Circuit for the proposition that a litigant seeking to recover under the total cost method must prove each of the elements recommended in the AACE practice guide, the Court reserves judgment on the propriety of that recommendation.[28] But given that there seems to be no dispute between the parties that Chasney (like JWA) suffered at least *some* damage as a result of Project design defects and other deficiencies attributable to the Government, and given that the summary-judgment record contains at least *some* evidence corresponding to Chasney's damages (*e.g.*, the original delay claim and Paul Krogh's expert disclosure), the Court is reluctant to presume that Chasney *cannot* prove its damages to the requisite degree of certainty should this case proceed into a trial posture. The cases on which Defendants rely in explicating the four elements of the total cost method only elevate the Court's reluctance: in each of these cases, either an administrative agency or a trial court had the benefit of a full evidentiary record.[29]

---

[28] *But see Youngdale & Sons Constr. Co.*, 27 Fed. Cl. at 541 (explaining that failure to prove each of the total cost elements is "not fatal to a recovery of damages inasmuch as it may give rise to the court's use of an alternative, *i.e.*, the modified total cost method," and further defining the modified method as "simply *the* total cost method *modified* or adjusted for any deficiencies in the plaintiff's proof in satisfying the four requirements of said method"); *cf. United States ex rel. Taylor & Polk Constr., Inc. v. Mill Valley Constr., Inc.*, 29 F.3d 154 (4th Cir. 1994) (approving total cost claim in breach-of-contract action brought under the Miller Act).

[29] *Compare Propellex Corp. v. Brownlee*, 342 F.3d 1335 (Fed. Cir. 2003) (reviewing decision by ASBCA; applying substantial evidence standard), *and Raytheon Co. v. White*, 305 F.3d 1354 (Fed. Cir. 2002) (same), *with Cavalier Clothes, Inc. v. United States*, 51 Fed. Cl. 399 (2001) (analyzing plaintiff's claim in light of evidence received at

Courts in this District have repeatedly denied summary judgment in cases in which the plaintiff has adduced some evidence corresponding to its damages, even where such evidence seems incomplete or where the court is skeptical of the plaintiff's prospects at trial. *See, e.g.*, *Wright Sols., Inc. v. Wright*, Civ. No. CBD-12-178, 2013 WL 1702548, at *7 (D. Md. Apr. 18, 2013) (denying summary judgment to defendant where, construing the facts in the light most favorable to plaintiff, there was a "question of fact as to whether [plaintiff] suffered some out-of-pocket or otherwise compensable damages"); *Dierker v. Eagle Nat'l Bank*, 888 F. Supp. 2d 645, 658 (D. Md. 2012) (denying summary judgment where defendant had not shown that plaintiffs' alleged damages were too speculative to be submitted to the jury and where "[a]ny alleged flaws in the methodology [we]re the proper subject of cross examination, not the basis for summary judgment" (footnote omitted)); *Bertrand v. Children's Home*, 489 F. Supp. 2d 516, 522 (D. Md. 2007) (denying summary judgment to defendant because, although plaintiff's "proof of damages seem[ed] thin, at best," she had "projected sufficient evidence to get to the jury as to *some* amount"); *cf. Balt. Neighborhoods, Inc. v. Sterling Homes Corp.*, Civ. No. B-96-915, 1999 WL 1068458, at *2 (D. Md. Mar. 25, 1999) ("[A] trial court may deny summary judgment 'in a case where there is reason to believe that the better course would be to proceed to a full trial.'" (quoting *Anderson*, 477 U.S. at 255)).

In light of the foregoing, the Court's analysis on this second of Defendants' arguments *should* be straightforward:   though Chasney's cost-estimation strategy may have its flaws, Chasney has adduced sufficient evidence to create a triable question of fact on the issue of damages.   Yet this would-be straightforward analysis is muddled because Chasney's opposition brief omits any discussion of Defendants' cost-estimation argument.   Chasney neither addresses

---

trial and arguments presented in posttrial briefs), *and Meva Corp. v. United States*, 511 F.2d 548 (Ct. Cl. 1975) (per curiam) (reviewing recommendation of trial judge).

the four-part test from the AACE practice guide nor analyzes the relevant case law nor makes any mention of Paul Krogh's testimony.[30]

Litigants ignore arguments in dispositive motions at their peril. *See, e.g.*, *Khoshmukhamedov v. Potomac Elec. Power Co.*, Civ. No. 8:11-cv-00449-AW, 2013 WL 639043, at *7 (D. Md. Feb. 19, 2013) (granting summary judgment to defendant on plaintiffs' breach-of-contract claim where plaintiff failed to address defendant's argument concerning consequential damages); *Ferdinand–Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) (treating plaintiff's discriminatory-discharge claim as abandoned where plaintiff failed to address defendant's assertion that she did not include such claim in her EEOC charge). Nevertheless, summary judgment is only appropriate where the moving party shows that there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).[31]  Here, as the Court has explained, the record contains some evidence corresponding to Chasney's damages.   For that reason, and because the Court rejects Defendants' restrictive interpretation of the Subcontract's delay-damage provision, the Court concludes that Chasney has *narrowly* skirted summary judgment on its Miller Act claim with respect to damages arising after October 31, 2013.

---

[30] While failing to address Defendants' cost-estimation argument, Chasney devotes the bulk of its opposition brief to a seemingly irrelevant inquiry into whether James Ancel adequately informed Chasney about the Government's rejection of its delay claim and whether JWA impaired Chasney's rights under the Subcontract.  (*See* ECF No. 53 at 6-13.)  This discussion seems more apposite to the state-law breach-of-contract theory that Chasney proposed through its untimely Motion for Leave to Amend Complaint.  (ECF No. 37.)  But the Court denied that motion in its February 2, 2016, Memorandum and Order.  (ECF No. 52 at 12.)  Consequently, this case is not about whether JWA may have impaired Chasney's rights or what the consequences of such impairment might be; it is simply about whether and to what extent Chasney may recover damages associated with the labor and materials it provided under the Subcontract.

[31] *Cf. Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55-56 (4th Cir. 1994) ("While the [summary-judgment nonmovant] runs a great risk by not responding, such positive action is not required in all instances because the court still may only grant summary judgment if appropriate.  In determining if summary judgment is appropriate, the court should look to the movant's own papers in support of its summary judgment motion because they may demonstrate that a genuine issue exists as to a material fact.  The court should also determine if the record of filed depositions, answers to interrogatories, admissions, and affidavits, demonstrates that a genuine issue exists as to any material fact." (citations omitted)).

23

## VI.     *Conclusion*

For the reasons stated herein, an Order shall enter GRANTING Defendants' First Motion for Partial Summary Judgment (ECF No. 27) and DENYING Defendants' Second Motion for Partial Summary Judgment (ECF No. 51).

DATED this 3rd day of March, 2016.

BY THE COURT:


_____/s/_____
James K. Bredar
United States District Judge